SUPPLEE-WILLS-JONES MILK COMPANY, A PENNSYL-
VANIA CORPORATION, PROSECUTOR, v. WILLIAM B.
DURYEE, JOHN V. BISHOP, AND NILS B. SWENSON,
CONSTITUTING THE MILK CONTROL BOARD OF THE
STATE OF NEW JERSEY, AND THE MILK CONTROL
BOARD OF THE STATE OF NEW JERSEY, RESPOND-
ENTS.

Argued October 2, 1935—Decided December 11. 1935.

Before Justices CASE and BODINE.

For the prosecutor, *Wilfred B. Wolcott.*

For the respondents, *David T. Wilentz,* attorney-general,
and *Edward W. Currie,* assistant attorney-general.

The opinion of the court wes delivered by

CASE, J. The matter comes before us initially on a rule
to show cause why a writ of *certiorari* should not issue to
review "a certain order of the said milk control board of the
state of New Jersey designated as official order No. B-15."
It was stipulated by counsel that the court, if it should allow

the writ, might proceed immediately to a final determination thereof upon the record submitted under the rule. We think that a writ should issue, and we move to a final determination, assuming that a writ has issued, in accordance with the rule, to review order No. B-15.

It is first desirable to understand precisely what the order under review does. Order No. B-15, issued March 27th, 1935, effective April 1st, 1935, is an amendment and restatement of section 2 of order No. B-1, issued June 26th, 1934, effective July 1st, 1934. Order No. B-1 is not under review. Section 2 of the last named order segregated the counties of the state into numbered areas, classified milk as "Grade A" and "other than Grade A" and fixed minimum prices to be charged (1) by milk dealers to consumers, (2) by milk dealers to stores and (3) by stores to consumers. The significant change accomplished by order No. B-15, in so far as the present litigation is concerned, was to permit sales in areas Nos. 1 and 2 from milk dealers to stores and from stores to consumers without the deposit, which had theretofore been required, of one cent for the bottle. Consequently, stores were enabled to sell to consumers at a flat price of one cent below that charged for doorstep delivery by those, including the prosecutor, whom the order designates "milk dealers." The effect was to increase, potentially, the differential between the price at which prosecutor could sell and that at which the stores could sell, but prosecutor has waived that differential as a ground for reversal. Its field of contest therefore is limited to such provisions of B-15 as were already contained in B-1.

Prosecutor wrote down thirteen reasons why order No. B-15 should be set aside. Reasons numbered 1, 2, 3, 4, 8 and 13 are abandoned.

The fifth reason is that "official order No. B-15 is illegal and void in that, without legislative authority, it assumes to fix and determine minimum prices to be charged by milk dealers to stores, &c., in connection with sales of Grade A milk and milk other than Grade A."

The statute known as the Milk Control act, chapter 169, *Pamph. L.* 1933, ¶ 1, *art.* VII, as amended by chapter 132,

*Pamph. L.* 1934, provides that "the board may ascertain, determine and fix, by such investigations and proof as the emergency permits, the price to be paid to the producer and to be charged the consumer for milk in the several municipalities or markets of this state, under varying conditions, as will best protect the supply of fresh, wholesome and sanitary milk in this state, and insure a sufficient quantity of pure and wholesome milk to the inhabitants of this state, having special regard to the health and welfare of children and be most in the public interest. \* \* \*" The statute is specific. It concerns the price to be paid to a producer and the price to be charged a consumer, and those prices only. Article I of the statute defines nine words or expressions, namely, "board," "person," "milk dealer," "market," "licensee," "milk," "producer," "consumer," "sanitary regulations." "Producer" is "any person producing milk and/or cream delivered or to be delivered to any dealer or to any market in this state." "Milk dealer" is "any person who purchases for sale, produces for sale direct to consumer, purchases for distribution, distributing broker, any person who purchases, distributes or handles within or without the state, for storage, manufacture or sale in this state, except for consumption on the premises of the producer, milk and cream. Any co-operative association organized under any law of this or any other state is declared to be a milk dealer or producer within the meaning of this act, as the board may determine." "Consumer" is "any person, other than a milk dealer, who purchases milk for fluid consumption." A dairyman who makes house to house deliveries and a store which sells to the consumer are both "milk dealers" within the meaning of the statute. Stores are neither producers nor consumers.

The order under review undertakes to fix the price for the sale of milk from one milk dealer to another milk dealer. There is no statutory authority for that action. It is said by the respondent that the power of the board to fix such a price is to be found in article III, section 1 (a), which provides that the milk control board is declared to be the instrumentality of the state for the purpose of attaining the ends declared in the statute and is vested with power "to supervise

and regulate the entire milk industry of the State of New Jersey, including the production, importation, transportation, manufacture, storage, distribution, delivery and sale of milk and milk products in the State of New Jersey, in those matters as in the declaration of legislative policy and intent stated in this act to be necessary to control or prevent unfair, unjust, destructive and demoralizing practices which are likely to result in the undermining of health regulations and standards, the demoralization of agricultural interests in this state engaged in the production of milk; * * *," and in subdivision (g) of the same section, which provides that "the operation and effect of any provision of this act conferring a general power upon the board shall not be impaired or qualified by the granting to the board by this act of a specific power or powers, not inconsistent with the proviso contained in paragraph (a) of this article." It is, of course, not argued that subdivision (g) adds any authority to the general powers that is not already there. The general power relied upon is the authority "to supervise and regulate the entire milk industry * * * including the * * * delivery and sale of milk." We apprehend that there would be much doubt whether, in the absence of article VII, that language would be sufficient to include the power to fix the price. Supervision and regulation of the delivery and sale of an article do not necessarily include authority to fix the price. For illustration: The legislature a few weeks before passing the milk control bill enacted chapter 85, *Pamph. L.* 1933, which was "An act concerning the manufacture, distribution and sale of certain beverages having an alcoholic content and providing for licenses, regulations and fees in connection therewith and penalties for violations thereof." That statute contained numerous provisions regulatory of the sale of beverages within its purview, but in nowise did it assume to fix prices at which the beverages might be sold or to set up machinery for fixing prices. Authority to fix prices is not a necessary sequence to authority to regulate the manufacture, sale and delivery. We look upon article VII, not as an impairment or qualification of the general powers of the board, but as an amplification and extension thereof, and we are of the

opinion that the authority to fix prices is to be found only in that article. We find no authority therein for the fixing of a price from one milk dealer to another, and so reach our conclusion that the board has no such power and that the order is in that respect erroneous.

The sixth reason is that the order under review is illegal and void in that, without legislative authority, it assumes to fix and determine two kinds and grades of prices to be charged consumers for grade A milk and for milk other than grade A in area No. 1, and the seventh reason applies the same language to area No. 2. We are not sure that we understand precisely the point which prosecutor undertakes to make; but whatever be the objective of the argument, the argument turns upon the fact that in the 1933 statute the authority was to fix "the prices to be paid" and that by the 1934 statute the authority was to fix "the price to be paid." The plural was used in the one case and the singular in the other. We think that the distinction, in this instance, has no significance. The plural form was restored by chapter 175, *Pamph. L.* 1935. The context calls for an identical construction, whichever reading be given.

The ninth reason is that "official order No. B-15 is illegal, arbitrary, unreasonable and void in that it contains no statement or finding of the grounds upon which the milk control board's action in specifying the various minimum prices therein was based." It is our understanding that the board in determining the prices to be charged must ground those prices upon an investigation and proofs. That is a clear deduction from the reasoning of Chief Justice Hughes in the "hot-oil" cases (*Panama Refining Co.* v. *Ryan,* and *Amazon Petroleum Corp.* v. *Ryan,* 293 *U. S.* 388; 79 *L. Ed.* 223; 55 *Sup. Ct.* 241, was obviously the intent of the legislative language giving the authority and is, we think, within the assumptions in the opinion written by Mr. Justice Heher in *State Milk Control Board* v. *Newark Milk Co.,* 118 *N. J. Eq.* 504. The latter opinion holds, however, that there is a presumption that the order, when made, is a reasonable and valid exercise of the authority conferred and that the burden of establishing the contrary is upon him who asserts it. The

conflict seen by prosecutor between that holding and the expression of the United States Supreme Court in the "hot-oil" cases does not, we think, exist. The power of the board to fix prices depended upon no initial finding by the board that it ought to do so. The statute expressed the policy and the board's powers in great detail. One of the powers was to fix prices. That was given unconditionally. There was no finding, preliminary to the undertaking by the board of its work, that had to be made and therefore none that had to be stated. The exercise of the authority was to include, necessarily as we think, an investigation and the taking of proofs. The presumption under the *Newark Milk Co.* case is that that was done. There is no proof that it was not done or that the record thereof is not extant. The presumption is not overcome. Further: B-15 is but an amendment of one of the sections of an earlier order. All of the points in issue turn upon provisions of the amendment which are identical reprints of the section as contained in the original order. It will hardly be contended that on the occasion of a minor change the whole subject-matter must be reinvestigated and reheard or that each section of an order must contain recitals of authority and findings. The earlier order, whatever be its faults or merits, is not under review.

The tenth reason is that the order is void because it is an alteration and a modification of order No. B-1 and that there is no legislative policy or standard established by which such an alteration or modification may be made. If this means that once the board has acted it has exhausted its power and that the order made by that action is eternal and immutable, the contention is too weak for comment. But if, as we believe, the point is that an order fixing prices, whether original or amendatory, must be grounded in investigation and proofs, we refer to our discussion of the ninth reason. It is again noted that the only change effected by B-15 is not in dispute, and that the remaining provisions were all established by B-1 which is not before us for review.

The eleventh reason relates to the store differential.

The twelfth and final reason is that the minimum prices are arbitrary, oppressive and discriminatory, were fixed with-

out investigation and proof and were not necessary to protect the supply of fresh, wholesome and sanitary milk in this state or to insure a sufficient quantity of pure and wholesome milk to the inhabitants; and hereunder prosecutor argues that it is able and willing to sell milk to consumers of Camden and vicinity at the same price which it charges to consumers in Philadelphia without reducing prices to producers and without reducing wages paid to its employes. Much of what has been said is pertinent here, particularly that the prosecutor has not carried the burden of proving the assertions upon which it relies. It may be added that the argument totally disregards the statutory obligation upon the milk board to prevent demoralization of the agricultural interests engaged in the production of milk within this state.

The order under review will be set aside under the fifth reason; but without costs.